1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

ORDERED UNSEALED on 12/12/2024   s/ andreasar

**SEALED**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>            Plaintiff,<br><br>      v.<br><br>GEMMA TRAYA AUSTIN,<br><br>            Defendant. | Case No. **24mj4657**<br><br>COMPLAINT FOR VIOLATION OF<br><br>Title 18, U.S.C. Sec. 1956(h):<br>Conspiracy to Commit Money<br>Laundering; 18 U.S.C. § 982:<br>Criminal Forfeiture |

The undersigned complainant being duly sworn states:

At all times relevant to this Complaint:

**INTRODUCTION**

1.    A **book publishing scam** is a fraudulent scheme where criminals impersonate literary agents, publishers, major motion picture studios and popular video streaming services, to extract money from putative book authors, which are the victims of the scam.  As part of the scam, the criminals will operate a public-facing book publishing business that purports to act as an intermediary between putative authors (victims) and literary agents, publishers, major motion picture studios and popular video streaming services.  The criminals make false promises that the victim-author's book will be acquired by a publisher or turned into a movie or television series.  The criminals use a variety of social engineering techniques to gain the victim's trust and thereafter to

divest the victim of his/her money.

2.    GEMMA TRAYA AUSTIN ("AUSTIN") is a 58-year-old citizen of the United States.  At all times relevant to this complaint, AUSTIN resided in the Southern District of California.

3.    PageTurner, Press and Media LLC ("PageTurner") is a limited liability company incorporated in the State of California in September 2017.  PageTurner's principal place of business is located in Chula Vista, California.  GEMMA TRAYA AUSTIN is the organizer and registered agent for PageTurner.  According to PageTurner's public filings, it purports to be a "book publishing" business.

4.    Between at least 2018 and up to and including December 11, 2024, within the Southern District of California and elsewhere, a group of individuals ("the conspirators") operated a book publishing scam using PageTurner targeting elderly victims throughout the United States, including in the Southern District of California (hereafter "the fraud scheme").

5.    As part of the fraud scheme, the conspirators contacted putative victims through unsolicited interstate and foreign wire communications, including phone calls and emails.

6.    As part of the fraud scheme, the conspirators purported to operate PageTurner as a book publishing business that acted as a liaison between individuals who sought to publish their books and/or have their books turned into motion pictures and/or television series.

7.    As part of the fraud scheme, the conspirators made false representations regarding PageTurner's business, including by falsely representing the location of operations, its contacts and communications with literary agents, major motion picture studios and popular video streaming services.

8.   As part of the fraud scheme, the conspirators fraudulently impersonated literary agents and executives from major motion picture studios and popular video streaming services in order to perpetuate the perception that PageTurner was assisting book authors to get their works published and/or turned into motion pictures or television series.

9.   As part of the fraud scheme, once a putative victim-author was convinced by the conspirators that PageTurner had interest from a publisher, movie studio or video streaming service, the conspirators would use social engineering techniques to extract money under fraudulent pretenses from the victim-authors, including by claiming the victim-authors needed to pre-pay certain taxes or pay certain transaction fees before the victim-author's work could be published or optioned to studios.

10.   As part of the fraud scheme, the conspirators made fraudulent representations to victims about their books being selected for acquisition by traditional publishers and/or movie studios.

11.   As part of the fraud scheme, based on fraudulent pretenses, the conspirators induced victims to send money to PageTurner, including to bank accounts controlled by GEMMA TRAYA AUSTIN, for various publishing services the victims never received.

12.   Bank A is a major U.S. bank headquartered in Charlotte, NC.

13.   Bank B is a major U.S. bank headquartered in Minneapolis, MN.

14.   Bank C is a major U.S. bank headquartered in New York, NY.

15.   Bank D is a major U.S. bank headquartered in McLean, VA.

16.   All U.S.-based financial institutions referenced herein were insured by the Federal Deposit Insurance Corporation.

//

//

## COUNT 1

### (Conspiracy to Commit Money Laundering)

### [18 U.S.C. § 1956(h)]

17.    Paragraphs 1 to 16 are re-alleged and incorporated herein.

### THE CONSPIRACY

18.    Beginning on a date unknown, but at least since January 2018, and continuing up to and including December 11, 2024, within the Southern District of California and elsewhere, defendant GEMMA TRAYA AUSTIN, together with others known and unknown, did knowingly conspire, and agree:

a.    to knowingly conduct and attempt to conduct a financial transaction affecting interstate and foreign commerce, which involved the proceeds of a specified unlawful activity, that is conspiracy to commit mail and wire fraud, with the intent to promote the carrying on of the specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of unlawful activity, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i); and

b.    to knowingly conduct and attempt to conduct financial transactions affecting interstate commerce and foreign commerce, which transactions involved the proceeds of specified unlawful activity, that is, conspiracy to commit mail and wire fraud, knowing that the transactions were designed in whole or in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of specified unlawful activity, and that while conducting and attempting to conduct such financial transactions, knew that the property involved in the financial transactions represented the proceeds of some form of

1  unlawful activity, in violation of Title 18, United States Code,
2  Section 1956(a)(1)(B)(i).

3        c.   to transport, transmit, and transfer, and attempt to
4  transport, transmit, and transfer a monetary instrument or funds
5  involving the proceeds of specified unlawful activity, that is,
6  conspiracy to commit mail and wire fraud, from a place in the United
7  States to or through a place outside the United States, knowing that
8  the funds involved in the transportation, transmission, and transfer
9  represented the proceeds of some form of unlawful activity and knowing
10  that such transportation, transmission, and transfer was designed in
11  whole or in part to conceal and disguise the nature, location, source,
12  ownership, and control of the proceeds of specified unlawful activity,
13  in violation of Title 18, United States Code, Section 1956(a)(2)(B)(i).
14  All in violation of Title 18, United States Code, Section 1956(h).

15                    **MANNER AND MEANS**

16     19.  As part of the conspiracy, Defendant GEMMA TRAYA AUSTIN opened
17  at least four bank accounts in the name of PageTurner with financial
18  institutions in the United States, including Bank A, Bank B, Bank C,
19  and Bank D.

20     20.  As part of the conspiracy, Defendant GEMMA TRAYA AUSTIN
21  received victim funds in bank accounts established on behalf of
22  PageTurner and caused the further withdrawals and transfers of victim
23  funds to domestic and international bank accounts controlled by AUSTIN
24  and her co-conspirators.

25     21.  As part of the conspiracy, after victims sent the funds to
26  PageTurner accounts, defendant GEMMA TRAYA AUSTIN transferred the
27  proceeds of the fraud scheme by making cash withdrawals and by
28  transferring the money to other accounts controlled by AUSTIN and/or her

co-conspirators, in order to conceal and disguise the nature, location, source, ownership, and control of the proceeds.

22. As part of the conspiracy, to conceal the location and control of proceeds of the PageTurner book publishing scam, defendant GEMMA TRAYA AUSTIN wired victim proceeds internationally to her co-conspirators' banks in the Philippines.

23. As part of the conspiracy, defendant GEMMA TRAYA AUSTIN used the proceeds of the PageTurner book publishing scam to further promote the fraudulent scheme. Namely, AUSTIN used the proceeds to pay for advertisements, issue refunds, and to pay small "royalties" to gain the victims' trust in order to promote or maintain the appearance of PageTurner as a legitimate publisher.

24. As part of the conspiracy, between January 2018 through April 2024, defendant GEMMA TRAYA AUSTIN conducted tens of millions in monetary transactions involving proceeds of the fraud scheme, and received millions of dollars in fees as compensation.

All in violation of Title 18, United States Code, Section 1956(h).

**FORFEITURE ALLEGATIONS**

25. The allegations contained in this Complaint are re-alleged and by reference fully incorporated herein for the purpose of alleging forfeiture to the United States of America pursuant to the provisions of Title 18, United States Code, Section 982(a)(1).

2. Upon conviction of the offense set forth in the Complaint, defendant GEMMA TRAYA AUSTIN shall forfeit, pursuant to Title 18, United States Code, Section 982(a)(1), all her rights, title, and interest, in any property, real and personal, involved the offense and any property traceable to such property. The properties to be forfeited include, but are not limited to:

a.    the real property located at 484 Jamul Ct, Chula Vista California, 91911, more particularly described as: Lot 4 of Country Club View No. 3, in the City of Chula Vista, County of San Diego, State of California, According to Map Thereof No. 4428, Filed in the Office of the County Recorder of San Diego County, December 29, 1959;

b.    $3,504,126.37 seized from Bank A business checking account number ending in -8816 in the name PageTurner Press and Media LLC;

c.    $904,939.16 seized from Bank C account number ending in -7639 in the name GEMMA TRAYA AUSTIN;

d.    $31,419.13 seized from Bank C checking account number ending in -9011 in the name PageTurner Press and Media LLC;

e.    $1,442,345.69 seized from Bank D checking account number ending in -2745 in the name PageTurner Press and Media LLC.

3.    If any of the forfeitable property, as a result of any act or omission of the defendant:

a.    cannot be located upon the exercise of due diligence;

b.    has been transferred or sold to, or deposited with, a third party;

c.    has been placed beyond the jurisdiction of the Court;

d.    has been substantially diminished in value; or

e.    has been commingled with other property which cannot be subdivided without difficulty; it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 18, United States Code, Section 982(b) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the forfeitable property.

All pursuant to Title 18, United States Code, Sections 982(a)(1), 982(b), Title 21, United States Code, Section 853(p), and Title 28, United States Code, Section 2461(c).

The complainant states that this complaint is based on the attached Statement of Facts incorporated herein by reference.

_____
Special Agent Jessica Hefron
Federal Bureau of Investigation

Sworn and attested under oath by telephone, in accordance with Federal Rule of Criminal Procedure 4.1, this 11th day of December, 2024.

_____
Hon. Jill L. Burkhardt
United States Magistrate Judge

### STATEMENT OF FACTS

**A.    Background**

26.    A **book publishing scam** is a fraudulent scheme where criminals impersonate literary agents, publishers, major motion picture studios and/or popular video streaming services, to extract money from putative book authors, which are the victims of the scam.  As part of the scam, the criminals will operate a public-facing book publishing business that purports to act as an intermediary between putative authors (victims) and literary agents, publishers, major motion picture studios and popular video streaming services.  The criminals make false promises that the victim-author's book will be acquired by a publisher or turned into a movie or television series.  The criminals use a variety of social engineering techniques to gain the victim's trust and thereafter to divest the victim of his/her money.

27.    **PageTurner, Press and Media LLC ("PageTurner")** is a limited liability company incorporated by GEMMA TRAYA AUSTIN in the State of California in September 2017.  PageTurner's principal place of business is located in Chula Vista, California.  According to PageTurner's public filings, it purports to be a "book publishing" business.

28.    **GEMMA TRAYA AUSTIN** is a resident of Chula Vista, California, and is the registered agent and the public face of PageTurner. AUSTIN was the only official manager of PageTurner from its registration in 2017 until about March 2024, when Individual-2[1] was added as the manager of PageTurner, with GEMMA AUSTIN becoming the registered agent for

---

[1] On December 9, 2024, the Honorable Jill L. Burkhardt, U.S. Magistrate Judge, authorized a federal complaint charging two of AUSTIN's co-conspirators with conspiracy to commit mail and wire fraud.  In that complaint, GEMMA AUSTIN was identified as "Individual-1" and a second individual was identified as "Individual-2."  To maintain consistency, the same naming convention is used here to identify the same individual.

PageTurner.  Individual-2 is a relative of GEMMA AUSTIN.

**B.   Investigation Background**

29.   Since May 2022, the FBI has been investigating a sophisticated book publishing scam operated by the defendants using PageTurner.  Based on the investigation, elderly book authors nationwide have been solicited by "employees" of PageTurner, offered opportunities to publish or distribute their books, or to turn their work into movies or streaming video series.  The conspirators claim to be literary agents familiar with the victims' books and present themselves as complimentary of the victims' work.  The conspirators then offer victims to work with PageTurner to promote their respective works.  Using social engineering techniques, the conspirators establish relationships and build trust with the victims by continuing to send interstate and foreign communications, including emails and text messages, over days, weeks, or months with victims.  Once a victim agrees to work with PageTurner, the conspirators then use additional social engineering techniques to extract money from victims under fraudulent pretenses, including by impersonating literary agents and/or executives from major motion picture studios or popular video streaming services, and by falsely claiming advance payments, fees, or taxes have to be paid before the victims' work can be published, promoted, distributed, or turned into motion pictures or television series.

**C.   PageTurner, Press and Media LLC**

30.   According to the articles of organization filed with the California Secretary of State on September 25, 2017, PageTurner was registered as a California business with its principal address at 601 E Palomar Street Suite C478, Chula Vista, CA 91911.  The Statement of Information filed with the California Secretary of State on March 6,

2024, lists PageTurner's mailing address at 484 Jamul Court, Chula Vista, CA 91911, GEMMA TRAYA AUSTIN as the registered agent, and Individual-2 as the manager of PageTurner.

31.   PageTurner promotes itself online via a website (pageturner.us registered in 2017) and social media (LinkedIn, Facebook, and X (formerly Twitter)) as a business located in Chula Vista.  Additionally, in about May 2023, PageTurner obtained an accreditation from Better Business Bureau, claiming that the business is based in Chula Vista.  Below is a screenshot from PageTurner's website:



32.   Based on the investigation, employees of PageTurner contacted victims using phone numbers with the local area code (619), which corresponds with the San Diego area, and sent emails using the domain pageturner.us.  Documents provided by victims and records received from Google revealed over 200 custom email addresses created using the domain pageturner.us.  According to the California Employment Development Department ("EDD") records, however, from 2017 through 2023, PageTurner did not file wage reports for any employees.

**D.    The Defendant**

33.   **GEMMA TRAYA AUSTIN** is a Chula Vista, California, resident who presents the public image of a successful business executive at

PageTurner.  AUSTIN's role in the conspiracy is to supply bank accounts for PageTurner to receive victims' funds.  As part of her role, from 2018 through 2024, AUSTIN opened at least four bank accounts for PageTurner at four different financial institutions.  From January 2018 through April 2024, AUSTIN laundered over $44 million dollars and received approximately $8.8 million as her fee.

34.  After victims sent the funds to PageTurner, in order to conceal and disguise the nature, location, source, ownership, and control of the proceeds, AUSTIN laundered the proceeds by making cash withdrawals or by transferring the money to other accounts controlled by AUSTIN or her co-conspirators, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i) (concealment money laundering).  To conceal the location and control of proceeds, AUSTIN also wired a large portion of the proceeds internationally to her co-conspirators' banks in the Philippines, in violation of Section 1956(a)(2)(B)(i) (international money laundering).  Additionally, AUSTIN engaged in promotional money laundering by using the proceeds of the PageTurner book publishing scam to continue the fraudulent scheme.  Namely, AUSTIN used the proceeds to pay for advertisements, issue refunds, or pay small "royalties" to gain the victims' trust in order to promote or maintain the appearance of PageTurner as a legitimate publisher, in violation of Title 18, United States Code, Section 1956(a)(1)(A)(i).

**E.    The Fraud Scheme**

35.  Elderly book authors nationwide have reported being solicited by "employees" of PageTurner and being offered opportunities to publish or distribute their books, or to turn their work into movies or streaming video television series.  The conspirators claim to be literary agents familiar with the victims' books, sound extremely complimentary, and

offer the victims to work with PageTurner to promote their books.  The conspirators establish relationships and build trust with the victims by continuing to email or message over days, weeks, or months.  The conspirators convey that they are convinced that with a little investment on both sides, the victims' works would be marketable to the biggest publishing or entertainment companies.  The conspirators appear to follow various scripts to tailor the "book project" pitch to the particular victim.  In some cases, PageTurner representatives promise to promote the victim's book and turn it into a movie.  In other cases, conspirators offer to distribute the book and pay royalties to the victim.  The victims are generally asked to sign a non-disclosure agreement regarding the "book project."

36. Once the authors agree to work with PageTurner, the conspirators explain that the "book project" will require authors to pay for various services such as purchasing book insurance, getting their book updated, hiring a team of publicists to promote their book, or creating an audiobook or a screenplay to be sold as a feature production. The conspirators then usually offer, for a fee, to connect the victims with the right people who can provide reasonably priced services such as updating book covers or taking out ads in national newspapers.

37. The conspirators falsely promise to secure book deals from well-known publishers[2] (Publisher H, Publisher M, Publisher P) with large advance payments. As part of the scam, PageTurner "agents" send victims fake acquisition contracts and offers from the "publisher" bearing the companies' logos.  The same scam also leads other victims to believe that legitimate motion picture studios or entertainment companies

---

[2] To protect victims' identities, real names of the companies are replaced with initials throughout.

(Studio M, Studio N, Studio S) are offering to buy the rights to the victims' work to be turned into a movie or a television series. The authors are told they must first pre-pay various costs such as taxes, advertising, licensing and distribution, which are all collected by PageTurner. Once the victims are deceived into believe there is an offer to purchase the rights to the victims' work, the conspirators often request larger and larger sums of money to make sure the "deal" can be completed. In the end, after making numerous promises, and collecting thousands of dollars, the conspirators deliver zero results and disappear.

38. As part of this investigation, I have reviewed evidence voluntarily provided by multiple victims, including fraudulent emails and records purportedly sent by legitimate publishers and entertainment companies. Agents also contacted representatives from several legitimate entertainment companies and publishers and discovered that the companies had no working relationships with PageTurner or its employees. Specifically, investigators contacted and interviewed official representatives of Studio M, Studio N, Studio S, Publisher H, Publisher M, and Publisher P. The interviews confirmed that the emails and records victims received were fake, that PageTurner had no connection or business relationships with PageTurner, and that many of the companies had received consumer complaints about PageTurner specifically.

39. For example, Publisher M's official website specifically warns authors about the PageTurner publishing scam:

> It has come to our attention that third parties continue to target authors to solicit money and personal information and that some of these schemes have involved the fraudulent use of [Publisher M's] company and imprint names. …

Specifically, third parties who are not affiliated with [Publisher M] have been impersonating our employees, as well as literary agents, editors, and providers of other literary services via phone calls, email, and social media, and requesting money, manuscripts, and personal details in exchange for assistance in having their work published. They even create fraudulent documents using our logo. Please do not trust these types of documents, especially if they are sent to you in the form of screenshots. Communications like these are fraudulent.

Please be aware that [Publisher M] does not work with or have any relationship with the following:

…

PageTurner Press & Media.

**F.    Victim of the Fraud Scheme Linked to GEMMA AUSTIN**

40.    Through the investigation, agents have interviewed more than a dozen victims nationwide who fell prey to the book publishing scam involving PageTurner.  Based on my investigation, the scheme remains ongoing.

41.    The following example documents a report from Victim R.G.1 ("Victim-1"), a 67-year-old male resident of Argentina.  Victim-1 previously resided in Arizona.  Between November 2020 and July 2021, Victim-1 sent a total of $80,800 to PageTurner. As described below, after discovering he was defrauded, Victim-1 was able to obtain a partial refund from PageTurner, issued by GEMMA AUSTIN.

42.    Victim-1 reported that in about August 2020, Victim-1 was contacted by a PageTurner publicist named "Danny Evans" who claimed that PageTurner wanted to turn Victim-1's books into a series with Studio N. Evans emailed (using danny.evans@pageturner.us) a letter of endorsement from Studio N which included official-looking Studio N's logos. The letter stated that Victim-1's book "has been picked for the [Studio N] Endorsement, this is under the TV Series adaptation.  We are requesting for the book's treatment, showing a comprehensive summary on how to effectively adjust your book into a screenplay. This should accentuate

the story's plot, thought, and characters."  The letter made further promises purportedly on behalf of [Studio N] as follows:

> [Studio N] will cover all production and post-production expenses under a strict budget allocation of $150,000.00 per episode. This includes shooting costs, talent costs, and post-production editing cost, such as graphics, soundtrack, and sound effects. The budget also covers extensive distribution and marketing costs. [Studio N] will exclusively buy the TV distribution and production rights in the amount not lower than $500,000.00. Furthermore, the profit distribution will be 50% to [Studio N], 38% to the Author, and 12% to the [Publisher].  Thank you and we look forward for a more fruitful partnership.

43.  Over the course of the year, Evans continued to email Victim-1 and requested funds for various additional services such as formatting, marketing, and promotion of Victim-1's books.  In addition, Victim-1 reported that he exchanged emails and phone messages with "James Adler," allegedly PageTurner's Senior Book-Agent Acquisition Specialist using the email james.adler@pageturner.us.

44.  PageTurner representatives alleged that [Studio U] was also interested in Victim-1's work and made promises of associating two A-list Hollywood actors with the project.  Evans offered to raise funding and interest for the project in exchange for an initial $90,000 fee, but eventually that number increased to approximately $130,000.  As a result of these fraudulent representations, Victim-1 stated he made payments totaling approximately $97,000 via wire transfer and credit card transactions.

45.  Victim-1 was also contacted by "Stacy Green" (stacygreen@sonyworldwideacquisitions.com) to notify Victim-1 that the project was selected for film production in an alleged joint Studio N / Studio S venture.

46.   According to Victim-1, in approximately October 2021, Victim-1 became suspicious and contacted Studio-N.  Studio-N denied sending a letter of endorsement to Victim-1 or having any connection or dealings with PageTurner.  Victim-1 hired an attorney, who filed a civil lawsuit in the Philippines against Innocentrix as the parent company of PageTurner.

47.   During the litigation, Victim-1 learned that Innocentrix, which is based in Cebu, Philippines, is the parent company for PageTurner; that Innocentrix's President and CEO is Michael Cris Traya Sordilla;[3] and that Evans also worked for Innocentrix.  Victim-1 also obtained a copy of the cease-and-desist letter from Studio-N dated November 23, 2021, which was signed by Studio N's Director of Litigation and addressed to PageTurner.  The letter stated:

> We have recently been informed that Page Turner Press & Media has sent communications to authors, purporting to show that Page Turner has secured development deals with [Studio N] for development of television or film projects based on those authors' works. We also understand that Page Turner has obtained funds from those authors in connection with these development projects. Attached are samples of documents we have been provided, in which Page Turner purports to have some connection to [Studio N].
>
> More than one person has contacted us, explaining that they have been victimized by this scheme. We also understand that Page Turner has many affiliated companies, through which it operates this scheme. We also understand that, when confronted, Page Turner has demanded that an author settle for some portion of the money paid, and sign a release agreeing not to make any claim against Page Turner.
>
> [Studio N] has no affiliation with Page Turner Press & Media, nor any of the entities we have been made aware of running the same scheme. We demand that you immediately cease and desist

---

[3] As discussed below, Michael Cris Traya Sordilla ("Sordilla") is GEMMA AUSTIN's relative who is involved in the PageTurner scam. Sordilla recently traveled to the United States and was staying with GEMMA AUSTIN prior to his arrest on December 9, 2024, on charges of conspiracy to commit mail and wire fraud related to the book publishing scam described herein.

using [Studio N]'s name, trademark(s), logo(s), trade dress and/or associated goodwill in your efforts to promote your services, or to elicit money from anyone. If you have represented to anyone that you have secured development interest from [Studio N] in their project in this manner, we demand that you immediately contact them and inform them of the truth. If you have obtained any money from those authors under the guise of securing a deal with [Studio N], we demand that you return it.

48. According to records provided to investigators by Victim-1, on or about November 22, 2021, the cease and desist letter from Studio N was emailed to finance@pageturner.us and also sent, via FedEx, to Page Turner, Press and Media at 601 E Palomar Street in Chula Vista, CA 91911.

49. Investigators visited the mailing address, 601 E Palomar Street, and observed a Postal Annex at that location. Investigators subsequently obtained records from Postal Annex, confirming that on about October 10, 2017, GEMMA AUSTIN opened mailbox 478 at the 601 E Palomar Street location for PageTurner, listing info@pageturner.us as a contact email address. The same email is listed as a contact on the PageTurner's website.

50. Victim-1 also provided records to investigators showing that PageTurner agreed to issue a refund to Victim-1 to settle the lawsuit. On about December 1, 2021, Victim-1 sent his bank account information to finance@pageturner.us. On the same day, "Finance Team PageTurner" replied by email to Victim-1 and stated: "We would like to inform you that pursuant to our prior agreement, we have already sent via bank deposit the partial amount of $65,000.00 to your bank today. Attached is the deposit receipt / transaction details as proof of the said transaction. You may contact your bank to verify the payment. Thank you. Sincerely, Finance Team PageTurner Press and Media." Attached to the email was a JPMorgan Chase Bank receipt for a $65,000 deposit into a

savings account as proof of the partial refund PageTurner issued to Victim-1 as part of the lawsuit settlement.

51.    Investigators further corroborated the records provided by Victim-1.    A review of the PageTurner's bank records revealed a corresponding $65,000 check issued to Victim-1 on December 1, 2021, signed by GEMMA AUSTIN.    The memo on the check stated, "Refund for the Availed Services First Half."    This transaction appears to be consistent with promotional money laundering because the proceeds of criminal activity are used to continue the fraudulent scheme; namely, the purpose of issuing a refund is to promote or maintain the appearance of PageTurner as a legitimate publisher.

**G.    Follow-On Investigation**

52.    On January 31, 2024, the Honorable Daniel E. Butcher, U.S. Magistrate Judge, authorized search warrants for several Google email accounts involved in the PageTurner scam.    I reviewed the email account info@pageturner.us and found a December 10, 2019, email sent by GEMMA AUSTIN to an online payment processing company, in which she explained PageTurner's business as being fully conducted online:

> PageTurner Press and Media, LLC is an online-based company that works with author customers in marketing and publishing any types of books.    Majority of the time in selling, production, fulfillment, and product or service delivery happens online, thus it doesn't require my employees to physically be in the office. The Palomar St., Chula Vista, address we have is a receiving and forwarding mail that will facilitate receiving of materials from our clients for book production.

53.    In my review of records obtained from Google pursuant to the federal search warrants I also discovered evidence the PageTurner book publishing scam is coordinated by GEMMA AUSTIN's nephew, Michael Cris Sordilla, and his domestic partner, Bryan Navales Tarosa, in the

Philippines.  On December 9, 2024, the Honorable Jill L. Burkhardt, U.S. Magistrate Judge, authorized a criminal complaint charging Sordilla and Tarosa with conspiracy to commit mail and wire fraud in connection with the fraud scheme described in this affidavit.  According to the complaint, Sordilla and Tarosa use Sordilla's company Innocentrix and its employees in the Philippines to pose as PageTurner agents under fictitious names and personas to defraud victims into sending money to PageTurner as part of the fraud scheme.

54.  GEMMA AUSTIN was in communication with Sordilla by email about financial matters during the relevant time frame.  For example, on February 26, 2021, Sordilla, using at mike.sordilla2013@gmail.com. sent an email to GEMMA AUSTIN at gemma.austin@pageturner.us, with Subject: Invoice for January – February 2021. In the email, Sordilla wrote, "Dear Gemma, please see attached invoice due and payable to Innocentrix Philippines" and provided account information for an Innocentrix account at the Metrobank.  As discussed below, as part of the conspiracy, in order to conceal the location and control of victim proceeds, AUSTIN sent multiple international wires totaling over $20 million to Innocentrix bank accounts in the Philippines.

55.  On another occasion, on August 26, 2021, GEMMA AUSTIN, using gemma.austin@pageturner.us, forwarded an email to Sordilla at mike.sordilla2013@gmail.com, which indicated she authorized Sordilla to use her debit card for marketing Innocentrix on Facebook:

> I, GEMMA TRAYA AUSTIN, owner of PageTurner Press and Media, a company based in California USA, authorizes my nephew and my business partner, MICHAEL CRIS TRAYA SORDILLA, to use my visa debit card 6941* for Facebook marketing since I am the one sponsoring his company's marketing which is INNOCENTRIX PHILIPPINES, OPC owned by him.

He is further authorized to use my card for his further facebook marketing for whatever purpose it may serve him.

Should you need any verification from me, you can contact me via email. Attached are my valid ID and my business permit (IRS).

Thank you and let me know if you have any questions.

Sincerely,

Gemma Austin
Business Owner
PageTurner Press and Media

56. Both Sordilla and Tarosa were arrested on December 9, 2024, after they were recently seen at GEMMA AUSTIN's residence in Chula Vista, California. At the time of their arrest, agents seized over $40,000 in cash from Tarosa's purse. Tarosa was advised of his *Miranda* rights and provided a statement, admitting that the currency was from PageTurner and claimed the money was going to be used to buy laptops for Innocentrix.

57. I have reviewed bank records for business bank accounts located at Bank A, Bank B, and Bank C associated PageTurner Press and Media. The bank records cover time periods starting January 1, 2018 through May 2024. During this time period, GEMMA AUSTIN made cash withdrawals totaling over $250,000 in 2022, over $302,000 in 2023, and over $70,000 from January 2024 through May 2024. Based on this evidence, the currency seized from Tarosa and his statements, as well as the fact that Sordilla and Tarosa stayed with AUSTIN before they were arrested, I believe that GEMMA AUSTIN withdrew proceeds of the book publishing scam from the PageTurner accounts she controlled to provide the cash to Sordilla and Tarosa. I further believe that these withdrawal transactions were designed to conceal and disguise the nature, location,

source, ownership, and control of the proceeds, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i).

**H.    AUSTIN Is Aware of Fraud in PageTurner Accounts**

58.    Based on my review of GEMMA AUSTIN's PageTurner email account, I know that AUSTIN received notifications of fraud from banks and payment processing companies.    Additionally, as described below, banks eventually froze and closed PageTurner accounts due to fraudulent activity.    For example, November 15, 2021, a Bank B employee emailed GEMMA AUSTIN to inquire about a fraudulent wire:

> Good morning Gemma, I received a notification from our wire department regarding an incoming wire Of $20,980.00 on 9-29-2021 is being recalled for fraud. The [other bank] has provided notice that their customer Screen Play for [Name of Book Redacted] Is claiming the wire transfer was done fraudulently. [Bank B] needs to respond to the [other bank].

59.    The next day, on November 16, GEMMA AUSTIN replied denying the fraud allegation and claiming "we got in touch with the client just today":

> I've looked into this matter with my business manager and the people handling the client's projects. After checking, we were able to establish that this is hardly a case of fraud since we were able to send receipt and agreement to the client. The receipt and agreement clearly stated the terms, process, and conditions of the services the client availed from us. The client is also aware of the projects' turnaround time. To note, the agreement outlining our terms and conditions was signed and approved by the client.
>
> Please know that this report came as a surprise to us since the client has been very responsive and cooperative with us. In fact, we got in touch with the client just today and communicated this matter to the client and as per him, he was not aware of this incident. We have his email confirming that the payment made was valid and with his authorization. This was a bank-initiated action, and as a matter of fact, the client made mention of transferring banks since his bank

initiated this attempt without his knowledge or consent.

Considering this is not a client-initiated action, please consider this invalid.

Sincerely,

Gemma Austin
Business Owner
PageTurner Press and Media

60.  I have reviewed Bank B records and identified a $20,980 payment to PageTurner's account ending in 8384 on September 29, 2021, from purported Victim R.H. ("Victim-10")[4].  Victim-10 subsequently paid PageTurner on January 10, 2022 ($4,485), January 25, 2022 ($6,990), April 20, 2022 ($31,980), and September 13, 2022.  Between April 13, 2022, and December 18, 2023, PageTurner paid a total of $752.32 as "royalties" to Victim-10 from its Bank A account ending in 8816. Based on this evidence, I believe that GEMMA AUSTIN notified her co-conspirators about the complaint, and that the co-conspirators subsequently contacted the victim to reassure him (Victim-10) about PageTurner's legitimacy.  I also believe that AUSTIN initiated the "royalty" payments to the victim to promote the underlying fraud, i.e., to perpetuate the image of PageTurner as a book publishing business.

61.  On December 22, 2022, GEMMA AUSTIN received an email at info@pageturner.us from a payment processor, which stated, "Good morning Gemma, ... Unfortunately due to the history of chargebacks that have presented themselves, your business is too much of a risk to take on at this point in time. ... We will be able to leave you in our system for

---

[4] To be consistent with the related criminal complaint filed on December 9, 2024 against Sordilla and Tarosa, which ended with "Victim-9," and did not reference Victim R.H., I begin with "Victim-10."

the next few weeks while you look for a new processor, but we will have to close the account in January."

62.   The fact that a payment processor independently assessed the fraud risk associated with PageTurner's account, identified a history of chargebacks, and contacted GEMMA AUSTIN about the activity further buttresses my belief that GEMMA AUSTIN oversees the money laundering activities related to the fraud scheme.

**I.   GEMMA AUSTIN Uses PageTurner Accounts to Launder Proceeds**

63.   Based on the financial analysis of documents received from Bank A, Bank B, and Bank C, for the time period from November 1, 2018, through May 30, 2024, PageTurner accounts received approximately $38 million in deposits from over 300 potential victims.   In addition to receiving funds via wire transfers, from October 2020 through February 2024, PageTurner received over $13 million from their credit card merchant services account.   There is probable cause to believe that the funds originating from the credit card merchant services account were also proceeds of fraud, because based on my investigation, I identified that many victims made credit and debit card payments to PageTurner. Additionally, as discussed above, email evidence suggests that one of PageTurner payment processing companies had closed its account due to suspected fraud and consumer complaints.

64.   Based on my investigation, after receiving deposits of victims' funds, GEMMA AUSTIN then transferred the proceeds into other accounts controlled by the co-conspirators.   Specifically, PageTurner's Bank A and Bank B accounts were used to conduct multiple international wire transfers to Innocentrix in the Philippines, totaling over $22 million dollars. Of the $22.48 million sent, $22.42 million can be traced to proceeds of the fraud scheme. Below are the dates and amounts of some

of these transactions evidencing international money laundering by GEMMA AUSTIN:

```
    Date            Amount      Notes

    11/12/2020      $80,000     PAYMENT
    11/12/2020      $100,000    PAYMENT
    12/03/2020      $95,000     SERVICE PAYMENT
    12/14/2020      $95,000     PAYMENT
    01/06/2021      $100,000    PAYMENT
    01/14/2021      $100,000    PURPOSE OF WIRE: SERVICE PAYMENT
    02/02/2021      $100,000    INVOICE PAYMENT
    02/12/2021      $100,000    PURPOSE: SERVICE PAYMENT PHONE NUMBER:
+63917-318-8326
    03/01/2021      $100,000    PAY INVOICE
    03/01/2021      $100,000    PAY INVOICE
    03/12/2021      $100,000    SERVICE MAINTANENCE
    04/01/2021      $165,000    PAYING INVOICE
    04/15/2021      $165,000    SERVICE PAYMENT
    05/04/2021      $152,000    PAYING INVOICE
    05/28/2021      $152,000    PAYMENT
    05/28/2021      $102,000    PAYMENT
    07/06/2021      $142,000    SERVICE PAYMENT
    07/06/2021      $142,000    PAYMENT SERVICES
    07/29/2021      $140,000    SERVICE PAYMENT
    07/29/2021      $140,000    SERVICE PAYMENT
     8/30/2021      $18,000     SERVICE PAYMENTS
    08/30/2021      $182,000    SERVICE PAYMENTS
    09/15/2021      $182,000    SERVICE PAYMENT
    10/06/2021      $206,000    SERVICE PAYMENTS
    11/01/2021      $201,000    SERVICE PAYMENT
    11/24/2021      $201,000    SERVICE PAYMENT
    12/14/2021      $180,000    SERVICE PAYMENT
    12/14/2021      $180,000    PAYMENT SERVICES
    01/10/2022      $132,000    SERVICE PAYMENT
    01/10/2022      $132,000    SERVICE PAYMENT
    02/01/2022      $206,000    PAYING INVOICE
    02/08/2022      $206,000    PAY INVOICE
    03/01/2022      $160,000    PAY INVOICE
    03/01/2022      $160,000    PAY INVOICE
    03/23/2022      $480,000    SERVICE PAYMENT
    04/01/2022      $480,000    SERVICE PAYMENT
    05/16/2022      $308,000    SERVICE PAYMENT
    05/16/2022      $308,000    SERVICE PAYMENT
    06/02/2022      $588,000    PAYROLL SERVICE FEES
    06/07/2022      $588,000    SERVICE PAYMENT
    06/30/2022      $588,000    SERVICE PAYMENT
```

65.  Using PageTurner's Bank A and Bank B accounts, GEMMA AUSTIN also made over 45 check withdrawals, totaling over $6.2 million, made payable to GEMMA AUSTIN, which she deposited into a personal account at Bank C. Based on my training and experience, I believe these funds also represent proceeds from the fraud scheme.

66.  Additionally, using PageTurner's Bank A account, GEMMA AUSTIN made four check withdrawals, totaling over $341,000 that I believe are traceable to proceeds of the fraud scheme, made payable to GEMMA AUSTIN, which she deposited into several credit union bank accounts in her name.

67.  Notably, the transfers and withdrawals were often made shortly after the victim funds were deposited, which I believe evidence the intent to conceal or disguise the nature, source, origin, and location of the funds.  For example, on November 4, 2020, Victim-1 wired $14,000 to PageTurner's Bank B account.  On November 12, 2020, GEMMA AUSTIN sent two wires to Innocentrix in the Philippines ($100,000 and $80,000), and also made two check withdrawals: a check payable to GEMMA AUSTIN in the amount of $50,000 was deposited into personal account at Bank C, and a check payable to PageTurner in the amount of $20,000 was deposited into PageTurner's Bank A account.  Additionally, all the transfers above involving criminally derived proceeds were in the amounts over $10,000, in violation of Title 18, United States Code, Section 1957.

**J.   GEMMA AUSTIN Uses Proceeds to Purchase a Residence**

68.  After receiving victim funds via checks deposits from PageTurner's Bank B account, GEMMA AUSTIN transferred funds to an escrow to purchase a property in Chula Vista, CA.  On March 9, 2022, a wire transfer in the amount of $664,080.95, which represents proceeds of wire fraud and wire fraud conspiracy, was made from GEMMA AUSTIN's personal Bank C account to a title company with a memorandum "Re: 484 Jamul Court,

Chula Vista, CA." This wire transfer appears to be in connection with the purchase of real estate property located at 484 Jamul Court, Chula Vista, CA, which is the primary residence for GEMMA AUSTIN.

### K.    Banks Close PageTurner Accounts

69. As part of the investigation, I learned that several banks took steps to investigate and close PageTurner's bank accounts due to reports of fraud. On approximately February 29, 2024, Bank B closed PageTurner's account due to suspected fraud and consumer complaints, with GEMMA AUSTIN withdrawing the remaining balance of approximately $4,779,239.09. On or about May 20, 2024, Bank A froze all funds (approximately $3,700,000) held in the account belonging to PageTurner due to fraud. According to a Bank C representative, its Fraud Hotline Team began steps to close PageTurner's Bank C account and on or about August 14, 2024, a check for $1,843,624.79 was mailed to GEMMA AUSTIN and was subsequently deposited into an account at Bank D.

70. On September 24, 2024, the Honorable Michael S. Berg, U.S. Magistrate Judge, authorized federal seizure warrants to seize all funds held in PageTurner accounts at Bank A, Bank C, and Bank D, as well as in GEMMA AUSTIN's personal Bank C account. The agents subsequently seized $3,504,126.37 from PageTurner's Bank A account ending in 8816; $31,419.13 from PageTurner's Bank C account ending in 9011; $1,442,345.69 from PageTurner's Bank D account ending in 2745; and $904,939.16 from GEMMA AUSTIN's Bank C account ending in 7639.

71. Based on the foregoing, I believe GEMMA AUSTIN conspired to launder the proceeds of a sophisticated book publishing scam, and conducted transactions in proceeds designed to promote the PageTurner scam and to conceal or disguise the location or source of the funds.

## CONCLUSION

72. Based on the foregoing, I submit that there is probable cause to believe that since January 2018, and continuing up to and including December 11, 2024, within the Southern District of California and elsewhere, defendant GEMMA TRAYA AUSTIN, together with others known and unknown, knowingly and intentionally conspired to commit money laundering, in violation of Title 18, United States Code, Section 1956(h).

## REQUEST FOR SEALING

73. It is further respectfully requested that this Court issue an Order sealing, until further order of this Court, all papers submitted in support of this complaint, including the probable cause statement and arrest warrant. Sealing is necessary because premature disclosure of the existence of the warrant will seriously jeopardize the investigation in that it could cause the target to flee, or to tamper with or destroy information still in her possession, and could alert conspirators to the existence of the investigation causing them to tamper with or destroy evidence or notify confederates.

I declare under penalty of perjury that the foregoing is true and correct.

Jessica Hefron
Special Agent
Federal Bureau of Investigation